```
                                    ┌─────────────────────────┐
                                    │ USDC SDNY               │
                                    │ DOCUMENT                │
                                    │ ELECTRONICALLY FILED    │
UNITED STATES DISTRICT COURT        │ DOC #:                  │
SOUTHERN DISTRICT OF NEW YORK       │ DATE FILED:  3/31/09    │
                                    └─────────────────────────┘
```

```
----------------------------------X
                                  :     05 Civ. 4261 (LAP)(THK)
In re M/V RICKMERS GENOA          :     05 Civ. 6226 (LAP)(THK)
LITIGATION,                       :     05 Civ. 8841 (LAP)(THK)
                                  :     05 Civ. 9472 (LAP)(THK)
THIS DOCUMENT RELATES TO:         :
ALL ACTIONS                       :        OPINION
                                  :
----------------------------------X
```

LORETTA A. PRESKA, U.S.D.J.:

This Opinion concerns the extent of a cargo buyer's liability in the context of maritime disaster litigation. The buyer here, ESM Group, Inc. ("ESM Group"), purchased 900 tons of a granulated magnesium-based desulphurization reagent, known by the trade name "Super-Sul Mg-89" ("SS-89"), from its wholly-owned subsidiary, ESM (Tianjin) Co., Ltd. ("ESMT"). While en route on the high seas, the SS-89 allegedly caused or contributed to an explosion and fire aboard the M/V RICKMERS (the "RICKMERS"), the transporting vessel. The vessel owners (the "Rickmers Interests") and entities that owned or insured other cargo aboard the RICKMERS (the "Cargo Interests") have sued ESM Group, in its individual capacity and as an alter-ego of ESMT.[1] Specifically, the Cargo Interests and Rickmers

---

[1] The operative complaints or third-party complaints are: Sixth Amended Complaint, Chem One Ltd. v. M/V Rickmers Genoa, No. 05 Civ. 4261 (filed Sept. 1, 2006) ("Chem One Compl."); Third Amended Verified Complaint, Shandong Indus. Inc. v. M/V Rickmers Genoa, No. 05 Civ. 6226 (filed July 21, 2006) *(continued . . .)*

Interests assert claims against ESM Group based in common law

negligence, common law strict liability, the Carriage of Goods

by Sea Act ("COGSA"), breach of contract, and alter-ego theories

of liability.[2]

ESM Group now moves for summary judgment, seeking to

dismiss all claims asserted against it. The Cargo Interests and

the Rickmers Interests (the "Non-Moving Parties") oppose that

---

(. . . continued)("Shandong Compl."); Second Amended Complaint,
St. Paul's Travelers v. M/V Rickmers Genoa, No. 05 Civ. 8841
(filed Sept. 5, 2006) ("St. Paul's Compl."); Verified Complaint
In Rem and In Personam, Atl. Coast Yacht Sales, Inc. v. M/V
Rickmers Genoa, No. 05 Civ. 9472 (filed Nov. 9, 2005) ("Atlantic
Compl."); Amended Third-Party Complaint, Chem One v. M/V
Rickmers Genoa, No. 05 Civ. 4261 (filed Apr. 25, 2006)
("Rickmers Compl.") at ¶¶ 13-46.

In addition to ESM Group, the complaints or third-party
complaints assert claims against ESMT, in its individual
capacity and as an alter-ego of ESM Group; Pudong Trans USA Inc.
("Pudong") and U.S. Shipping, Inc. ("U.S. Shipping"), two
intermediary transporters tasked with transporting the SS-89 on
land (U.S. Shipping has been voluntarily dismissed from these
actions [dkt. no. 93 (4261 action)]); ESM II Inc. and ESM II,
LP, former parent companies of ESM Group, and; Ja Sung Marine
Co., Ltd., CS Marine Co. Ltd., and Sunwoo Merchant Marine Co.,
Ltd., constituting the ownership interests in the M/V SUN CROSS
(the "SUN CROSS"), another vessel that collided with the
RICKMERS. Also, additional cross-claims and counter-claims are
asserted against other cargo interests whose cargo may have
caused or contributed to the explosion and fire aboard the
RICKMERS. So far, no party other than ESM Group has made a
dispositive motion in this litigation.

[2] See Chem One Compl. at ¶¶ 13-39; Shandong Compl. at ¶¶ 22-55;
St. Paul's Compl. at ¶¶ 13-39; Atlantic Compl. at ¶¶ 16-21;
Rickmers Compl. at ¶¶ 13-46.

2

motion.[3]  For the reasons set forth below, the motion is GRANTED

in part and DENIED in part.

## I.   BACKGROUND

The following facts are derived from the affidavits, Rule

56.1 Statements, testimony, and exhibits.[4]  All facts are

---

[3] See Memorandum of Law in Support of Motion for Summary Judgment
of Defendant and Third-Party Defendant ESM Group Inc. [dkt. no.
84 (4261 action)] ("ESM Mem."); Rickmers' Memorandum of Law in
Opposition to ESM Group Inc.'s Motion for Summary Judgment [dkt.
no. 95 (4261 action)] ("Rickmers Opp'n Mem."); Plaintiffs'
Memorandum of Law in Opposition to Defendant ESM Group Inc.'s
Motion for Summary Judgment [dkt. no. 98 (4261 action)] ("Cargo
Opp'n Mem."); Reply Memorandum in Support of ESM Group's Motion
for Summary Judgment [dkt. no. 104 (4261 action)] ("ESM Reply
Mem.").

I held oral arguments on January 15, 2009 (not
transcribed).  I also considered the parties' supplemental
letter briefs:  ESM Group's January 22, 2009 Supplemental Letter
Brief; Rickmers's January 22, 2009, Supplemental Letter Brief;
ESM Group's January 27, 2009 Supplemental Reply Letter Brief;
and Rickmers's January 27, 2009 Supplemental Reply Letter Brief.

[4] See Affidavit of Eugene J. O'Connor in Opposition to ESM Group
Inc.'s Motion for Summary Judgment [dkt. no. 96 (4261 action)]
("O'Connor Aff."); Affidavit of Christopher H. Dillon in Support
of ESM Group Inc.'s Motion for Summary Judgment [dkt. no. 86
(4261 action)] ("Dillon Aff."); Defendant and Third-Party
Defendant ESM Group Inc.'s Local Rule 56.1 Statement [dkt. no.
87 (4261 action)] ("ESM Group 56.1 Stmt."); Rickmers' Rule
56.1(b) Statement in Opposition to ESM Group Inc.'s Motion for
Summary Judgment [dkt. no. 97 (4261 action)] ("Rickmers 56.1
Stmt."); Deposition of Douglas C. Lee (O'Connor Aff., Ex. 2),
conducted December 20-21, 2006 ("Lee Dep."); Deposition of
Daniel Batz (O'Connor Aff., Ex. 3), conducted December 20, 2006
("Batz Dep."); Deposition of Hartmut Meyer-Grunow (O'Connor
Aff., Ex. 4), conducted August 16, 2007 ("Meyer-Grunow Dep.");
Deposition of James Rotella (O'Connor Aff., Ex. 7), conducted
May 31, 2007 ("Rotella Dep."); Deposition of Rachel Liu
(O'Connor Aff., Ex. 17), conducted *(continued . . .)*

3

construed and all reasonable inferences are drawn in favor of the Non-Moving Parties. See infra Part II.B.

ESM Group is a New York limited liability corporation organized under the laws of Delaware. (ESM Group 56.1 Stmt. at ¶ 39; Rickmers 56.1 Stmt. at ¶ 39; O'Connor Aff. at ¶ 6.) Prior to 2005, ESM Group was affiliated with a group of related companies consisting of ESM II Inc., ESM II L.P., and ESM Manufacturing, L.P. (ESM Group 56.1 Stmt. at ¶ 40; Rickmers 56.1 Stmt. at ¶ 40; Batz Dep. 32:3-13; Meyer-Grunow Dep. 58:17-60:14, 90:10-12.) The ESM companies have or have had plants in several locations around the United States and abroad. (O'Connor Aff. at ¶ 6.) They produce a family of magnesium desulphurization reagent products, including SS-89. (Id. ¶¶ 7-8.)

SS-89 is "[u]sed as a desulphurizing reagent in steelmaking . . . [and] is designed to be injected into molten iron ore to remove sulphur and make the steel less brittle. Because it removes sulphur and consists of approximately 89% magnesium, it is regularly identified under the English language trade name

(. . . continued) October 2, 2007 (Liu Dep."); Deposition of Michael P. Donnelly (O'Connor Aff., Ex. 26), conducted May 30, 2007 ("Donnelly Dep."); Deposition of Judith A. Bell (O'Connor Aff., Ex. 28), conducted August 15, 2007 ("Bell Dep."); Deposition of Reinhard Schwede (Affidavit of Michael J. Walsh in Support of ESM Group Inc's Motion to Strike Portions of Opposition Submissions Judgment, Ex. B), conducted November 13, 2007 ("Schwede Dep."); Deposition of Zhou Zhou (Rickmers's March 9, 2009 Supplemental Letter, Exs.), conducted March 31, 2008 ("Zhou Zhou Tr.").

'Super-Sul Mg-89.'" (ESM Group 56.1 Stmt. at ¶ 3.)  Magnesium

based products liberate hydrogen gas when in contact with water,

especially sea or salt water. (O'Connor Aff. at ¶ 26, Lee Dep.

199:3-24; Schwede Dep. 174:4-175:16.)  Hydrogen gas is flammable

and susceptible to exploding. (Schwede Dep. 174:4-15; O'Connor

Aff., Ex. 27.)  According to a Material Safety Data Sheet

("MSDS") prepared by ESM Manufacturing L.P., SS-89 poses

"unusual fire and explosion hazards" and should be kept dry and

away from water and moisture. (O'Connor Aff. at ¶ 30, Ex. 27.)

In 1996, ESM Group created ESMT in Tianjin, China,

allegedly in order to save production costs, obtain lower prices

for materials previously imported by ESM Group, and avoid U.S.

anti-dumping regulations concerning the manufacture of SS-89.

(O'Connor Aff. at ¶¶ 7-11; Meyer-Grunow Dep. 49:13-51:15; ESM

Group 56.1 Stmt. at ¶ 42; Lee Dep. 13:13-14:8; Batz Dep. 34:21-

36:6; Rotella Dep. 34:10-18.)  ESMT is a wholly-owned subsidiary

of ESM Group and a limited liability corporation organized and

existing under the laws of the People's Republic of China. (ESM

Group 56.1 Stmt. at ¶ 41-42; Rickmers 56.1 Stmt. at ¶ 41-42.)

ESM Group established the ESMT plant, trained ESMT personnel,

transferred equipment from U.S. sites to the ESMT plant, and

provided ESMT with the formula for SS-89. (O'Connor Aff. at

¶¶ 9-10, 13-18; Lee Dep 14:12-15:24; Batz Dep 36:14-37:8,

138:16-139:10; Meyer Grunow Dep. 53:9-19.)  ESM Group brought

5

ESMT's engineers and plant manager to the United States for technical and corporate training. (O'Connor Aff. at ¶ 13; Batz Dep. 138:16-25; Meyer-Grunow Dep. 53:9-19.) ESM Group's CEO became President of ESMT. (O'Connor Aff. at ¶ 12; Batz Dep. 47:16-21.) ESMT's Board of Directors included, at times exclusively, ESM Group employees. (O'Connor Aff. at ¶ 12; Meyer-Gunow Dep. 88:7-89:20.) ESM Group directly paid ESMT's raw materials suppliers. (O'Connor Aff. at ¶ 19; Batz Dep. 96:8-97:19; Zhou Zhou Tr. at 33, 135-36.) ESM Group executives regularly visited the ESMT plant to monitor its operations, manufacturing, and shipping procedures. (O'Connor Aff. at ¶¶ 14-15, Exs. 10-12; Lee Dep. 28:16-23; Meyer-Grunow Dep. 55:15-56:13, 58:3-16; Rotella Dep. 70:17-23, 117:1-6.)

When ESM Group desired a shipment of SS-89 from ESMT, ESM Group would send ESMT a Purchased Material Service Specification outlining the chemical and physical make-up of the desired product. (See O'Connor Aff. at 17, Ex. 9.) Aside from these purchase orders, ESM Group and the related U.S. companies corresponded with ESMT managers about altering the chemical composition of SS-89 to ESM Group's requirements. (See, e.g., id., Exs. 8, 10.)

Sometime in or around 2000, ESM Group created and provided ESMT with a sample MSDS for the SS-89 product. (O'Connor Aff. at ¶ 32; Rotella Dep. at 64:9-65:3; Bell Dep. 36:20-37:6.)

Although ESM Group alleges that it "did not get involved in providing recommendations to [EMST] regarding safety measures in the production, storage or transportation of products which [ESMT] produces" (Dillon Aff. at ¶¶ 7, 13), ESM Group, acting through its predecessor ESM II, directed ESMT to include its own MSDS for shipments of SS-89 and requested test data on the product from ESMT before shipments were to be made. (O'Connor Aff., Exs. 9, 12.) ESMT created its own MSDS for magnesium granules but apparently never created an MSDS for SS-89. (Zhou Zhou Tr. at 94-99, Exs. 93-94, 108; Bell Dep. 41-43, 50-56.) ESMT's plant manager acknowledged that ESMT would have distributed an MSDS for SS-89 upon ESM Group's instruction to do so. (Rickmers January 22, 2009 Supplemental Letter Brief at 2, ¶ 9; Zhou Zhou Tr. at 93.)

In 2005, all of ESMT's production of SS-89 was sold to ESM Group, and ESM Group would not allow ESMT to sell SS-89 to other buyers. (Rickmers January 22, 2009 Supplemental Letter Brief at 2, ¶¶ 3-4; Zhou Zhou Tr. at 189-93.) Of the other products ESMT produced, only half were sold to buyers other than ESM Group. (Id.) As such, 85% of ESMT total production was sold or supplied to ESM Group. (Id.; see also O'Connor Aff. at ¶¶ 11, 20; ESM Group 56.1 Stmt. at ¶ 42; Batz Dep. 38:7-22; Rotella Dep. 34:10-18; Donnelly Dep. 293:13-22.) ESMT's net profits in 2004 and 2005 were $10,000 and $45,000, respectively. (Rickmers

January 22, 2009 Supplemental Letter Brief at ¶ 2, 5; Zhou Zhou
Tr. at 37, 40; Ex. 82.) ESMT did not report the payments ESM
Group made to ESMT's raw material suppliers as taxable income.
(Rickmers January 22, 2009 Supplemental Letter Brief at 2, ¶ 8;
Zhou Zhou Tr. at 238-39.)

On or about January 25, 2005, ESM Group sent ESMT a
purchase order for 900 metric tons of SS-89, C.I.F.[5] Baltimore.
(See Dillon Aff. at ¶ 2, Ex. A; ESM Group 56.1 Stmt. at ¶ 1.)
ESMT arranged for the SS-89 to be shipped from the ESMT Tianjin
plant to the United States aboard the RICKMERS. (Dillon Aff. at
¶ 16.) ESMT contracted with Pudong Trans U.S.A., Inc.
("Pudong"), a Non-Vessel Owning Common Carrier ("NVOCC"), to
transport the SS-89 from the Tianjin plant to port in Xingang,
China, where the RICKMERS[6] was docked. (Id. ¶¶ 16-17.) On or
about March 3, 2005, Pudong issued ESMT a bill of lading
identifying ESMT as the shipper and identifying "To Order of

---

[5] "C.I.F." or ("Cost, Insurance and Freight") is a commonly used
international commercial term meaning "that the seller delivers
when the goods pass the ship's rail in the port of shipment.
The seller must pay the costs and freight necessary to bring the
goods to the named port of destination BUT the risk of loss of
or damage to the goods, as well as any additional costs due to
events occurring after the time of delivery, are transferred
from the seller to the buyer." See Jan Ramberg, ICC Guide to
Incoterms 2000, at 119 (1999) (capitalization in original); (see
also Rickmers January 27, 2009 Supplemental Reply Letter Brief
at 2).

[6] The Rickmers was registered under the Marshall Island flag and
substantially owned by German companies. (See ESM Group 56.1
Stmt. at ¶ 18; Rickmers Compl. at ¶¶ 2-4.)

8

Shipper" as the consignee. (Id. ¶ 16, Ex. F; O'Connor Aff., Ex. 15.) Pudong then contracted with the Rickmers Interests to have the RICKMERS carry the SS-89 from China to Camden, New Jersey. (Dillon Aff. at ¶ 17.) Sometime thereafter, the Rickmers Interests issued a bill of lading identifying Pudong as the shipper and identifying U.S. Shipping, Inc. ("U.S. Shipping") as the consignee. (Id., Ex. G; O'Connor Aff., Ex. 16.) U.S. Shipping was to act as an intermediary NVOCC and releasing agent in the United States, apparently tasked to transport the SS-89 from Camden to Baltimore. (See O'Connor Aff. at ¶ 21; Liu Dep. 19.) There is no evidence ESMT informed any of these entities about the risks associated with transporting SS-89 by sea; ESMT also did not provide an MSDS. (O'Connor Aff. at ¶ 31.)

On or about March 2, 2005, ESMT placed 600 metric tons of SS-89, of the 900 total metric tons ordered, into sacks. (Dillon Aff. at ¶¶ 5, 14-15; ESM Group 56.1 Stmt. at ¶ 2.) ESMT tested the sacks to ensure they complied with U.S. Hazardous Material Regulations "dangerous when wet" criteria. (Dillon Aff. at ¶¶ 8, 10.) Based on fresh-water testing, the results were normal and within U.S. regulatory standards. (Id. at 11.) ESMT placed the packages into containers. (Id. at 15.) Pudong apparently picked up the containers and delivered them to the Xingang port that same day. On or about March 3, 2005, the containers were loaded

9

aboard the RICKMERS into Hold No. 1. (ESM Group 56.1 Stmt. at
¶ 10.)

On March 8, 2005, after having departed the Xingang port
and apparently stopping at other Chinese ports, the RICKMERS
collided with the SUN CROSS in foggy weather in the Yellow Sea.
(Id. ¶ 15.)  The RICKMERS suffered damage to her forward double-
hull plating, and flooding occurred in Hold No. 1. (Id. ¶ 17.)
Approximately four hours after the collision, an explosion
occurred in Hold No. 1, and a fire ensued. (Id. ¶ 19.)  The
containers of SS-89 were totally lost. (Id. ¶ 20.)

On April 11 and 12, 2005, a representative from ESM Group
faxed the director of the ESMT plant instructions to remove
certain language about fire and explosion hazards from ESMT's
MSDS for magnesium granules. (Zhou Zhou Tr. at 96-101; Exs. 93-
94.)  ESMT complied with ESM Group's instructions and prepared a
revised MSDS for magnesium granules. (Id. at 100:8-11, Ex. 108.)

On December 31, 2005, ESM Group became the corporate
successor in interest of ESM II Inc. and ESM II L.P., both of
which ceased to exist upon their merger into ESM Group. (ESM
Group 56.1 Stmt. at ¶ 40; Rickmers 56.1 Stmt. at 8, ¶ 40; Meyer-
Grunow Dep. 90:10-12.)

## II. DISCUSSION

### A. Jurisdiction

The complaints invoke this Court's admiralty subject matter jurisdiction. 28 U.S.C. § 1333(1). They allege that cargo loss and damage occurred aboard the RICKMERS while it was serving as a common carrier of merchandise on the high seas. Accordingly, subject matter jurisdiction is proper because the damages alleged here occurred on navigable waters and arise from traditional maritime activity. See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995); see also Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674-75 (1982).

The defendants do not contest personal jurisdiction.

### B. Summary Judgment Standard

Summary judgment should be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving-party bears the initial burden of demonstrating the absence of a genuine dispute of fact on each material element of the claims asserted. See Celotex, 477 U.S. at 323; see also FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994). The substantive law governing the suit identifies the

11

essential elements of the claims asserted and therefore indicates which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986). If the moving party carries her burden, the non-moving party must then "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials from the pleadings will not be sufficient to defeat summary judgment; instead, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The court must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. at 250.

To determine whether such an issue of fact exists, a court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253 (2d Cir. 2002) (citing Matsushita, 475 U.S. at 587). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is

12

competent to testify to the matters stated therein." Fed. R.
Civ. P. 56(e).[7]

## C. The Claims Asserted Against ESM Group

The Non-Moving Parties apparently assert the following
claims against ESM Group: (1) common law negligence claims
(general negligence and failure to warn), (2) a common law
strict liability claim, (3) Carriage of Goods by Sea Act
("COGSA") claims, (4) a breach of contract claim, and
additionally, (5) agency and veil piercing theories of
liability.[8]

However, I first note that the Non-Moving Parties have not
provided a coherent choice of law analysis for determining what
law should apply to these claims. The Non-Moving Parties have
at various times advocated for the application of New York law,
Delaware law, and federal maritime common law. As all parties

---

[7] I have taken into consideration the parties' submissions
regarding ESM Group's Motion to Strike Portions of  the
Opposition Submissions. [Dkt. no. 101 (4261 action)].   That
motion is unnecessary to the extent that it alleges certain test
reports are hearsay because I have not considered them.   The
motion is denied to the extent that it complains about
opposition Rule 56.1(b) statements, because any statements
relied on for the purposes of this Opinion are supported by
deposition testimony or potentially admissible documents from
the Record.

[8] The Non-Moving Parties' complaints, responses to
interrogatories, and briefings are notably vague.   Unless
otherwise indicated, I have construed the Non-Moving Parties'
arguments according to their presentation at the oral arguments.

13

now appear to agree that federal maritime common law applies, compare ESM Group's January 22, 2009 Supplemental Letter Brief at 3 & n.1, with Rickmers's January 27, 2009 Supplemental Letter Brief at 3, I will apply federal maritime common law in reviewing the claims in these consolidated actions. See In re Holborn Oil Trading, 774 F. Supp. 840, 843 (S.D.N.Y. 1991) (concluding that the parties' "implied consent concludes the choice of law inquiry"); see also Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980) (concluding that invocation of federal courts' maritime jurisdiction tends to result in the application of federal maritime common law).[9]

Additionally, I understand the Non-Moving Parties' position to be that claims 1-4 are asserted against ESM Group in its individual capacity and as an alter-ego of ESMT. As such, I will first consider claims 1-4 treating ESM Group and ESMT as separate corporate entities, not in an agency relationship. This treatment is proper because piercing the corporate veil and agency determinations should not be assumed but rather require consideration independent from the substantive merits analyses of asserted claims. See infra note 23. Then, in Part II.C.5, infra, I will consider whether the relationship between ESMT and ESM Group warrants piercing the corporate veil or concluding

---

[9] Any request for the application of a different body of law is denied as waived.

14

that they were principal and agent.  To the extent that either

of those findings is warranted, ESM Group may be liable for the

breach of contract, torts, or other liabilities of ESMT.

## 1.    Federal Maritime Common Law Negligence Claims

The Non-Moving Parties assert general negligence and

failure to warn claims against ESM Group. See Rickmers's March

25, 2008 Supplemental Letter Brief ("The failure to warn claim

is based on the dangerous characteristics of the [SS-89] that

were known to ESM Group . . . but not to [the Rickmers

Interests].  The negligence claim is based, among other things,

on the failure to test the product for its reaction to sea

(salt) water as opposed to distilled water.").

Under the federal maritime common law, a C.I.F. buyer

traditionally owes the carrier and fellow cargo interests no

tort-based duty to warn of risks associated with the buyer's

purchased cargo.  Nor do buyers owe carriers and fellow cargo

interests general duties of care. See Aslanidis v. U.S. Lines,

Inc., 7 F.3d 1067, 1077 (2d Cir. 1993) ("[I]mposing liability on

the purchaser of goods would be both unjustified and

illogical."); Di Gregorio v. N.V. Stoomvaart Maatschappij

"Nederland", 411 F. Supp. 331, 335 (S.D.N.Y. 1975) (noting in

the context of an F.O.B. contract that "[a] buyer normally has

no duty under the law to supervise the seller in the process of

15

producing or packing the purchased goods"). These rules derive from the common law of torts, which primarily imposes duties only in relation to a party's actions or conduct that foreseeably causes harm or damage. See generally Restatement (Third) of Torts § 7(a) and commentary (discussing the duty of care owed by "an actor"); id. § 18 and commentary (emphasizing that a duty to warn may arise only in relation to a defendant's "conduct"). Since C.I.F. buyers do not arrange for the carriage of their goods and tend to have little, if any, contact with the carrier and fellow cargo interests before and during the carriage, imposing tort-based duties on C.I.F. buyers would be particularly odd. In other words, plaintiffs can rarely point to an "act or omission on the part of [a C.I.F. buyer] that was negligent." Aslanidis, 7 F.3d at 1076.

Accordingly, courts sitting in common law have tended to reject buyer liability theories. See Excel Shipping Corp. v. Seatrain Int'l S.A., 584 F. Supp. 734, 747 (E.D.N.Y. 1984) (concluding that no negligence action may lie against a buyer whose purchased goods may have caused damage aboard a vessel during shipment); Atkins, Kroll & Co. v. Nedlloyd Line, 210 F. Supp. 315, 317 (N.D. Cal. 1962) ("As between carrier, shipper, and consignee, the consignee would be least likely to possess the necessary knowledge to have avoided any difficulty arising from improper packaging."); Garcia v. Sunbelt Trading (Kansas),

16

Inc., No. 04-01-00435-cv, 2003 WL 179763, at *2 (Tex. App. Jan. 29, 2003) (concluding that a buyer owes no duty of care to longshoremen to protect against harm caused by the buyer's purchased goods). The Non-Moving Parties have pointed this Court to no authority to the contrary.[10]

Some cases have intimated that a buyer's duty might lie if the buyer had unique knowledge or control over its purchased cargo. For example, in Aslanidis, the court reiterated the rule that a "buyer normally has no duty under the law to supervise the seller in the process of producing or packing the purchased goods," but apparently left open the possibility that a buyer might have a duty if it is in a unique position to protect against harm or warn of known risks. 7 F.3d at 1077 (internal quotation marks omitted, emphasis added). Similarly, in DiGregorio, the court noted that the "only conceivable reason

---

[10]  The authority the Non-Moving Parties rely on to support their theory of buyer common law liability is Narcissus Shipping Corp. v. Armada Reefers, Ltd., 950 F. Supp. 1129 (M.D. Fla. 1997). That case is inapplicable to the present inquiry because here ESM Group argues that ESMT's liability may not be attributed to ESM Group, whereas the shipper and its buyer/consignee in Narcissus stipulated that they were "so closely related that they could rightfully be referred to interchangeably," and the terms of their corporate or contractual relationship were not disclosed. Id. at 1132 n.1. Narcissus certainly does not stand for the proposition that a C.I.F. buyer, constituting a separate entity from the shipper, may be held liable in tort for the mere purchase of cargo that causes damage while in transit. And to the extent that the Non-Moving Parties rely on Thomas v. Itochu Project Mgm't, Inc., No. 01-00-00578-CV, 2002 WL 2023509 (Tex. App. Aug. 30, 2002) (unreported), I find that case unsupportive.

17

for imposing some additional duty on [the buyers] might be some circumstance putting [the buyers] on notice of inability or incompetence on the part of [the shipper] to do the proper packing." 411 F. Supp. at 335.

Irrespective of whether these statements are correct as a matter of law, I am not persuaded that ESM Group owed a duty to the Non-Moving Parties here. ESM Group did not manufacture, package, or ship the SS-89 cargo that was ultimately stowed aboard the RICKMERS. And even though ESM Group may have been significantly involved in the day to day operations of ESMT, there is no evidence that ESM Group had any involvement in the preparation or shipment of the particular SS-89 cargo that allegedly caused the damages in this case. The mere fact that ESM Group had general knowledge about the characteristics of SS-89 is insufficient to qualify ESM Group's purchase of the SS-89 shipped aboard the RICKMERS as duty-conferring conduct or action within the meaning of the common law of torts. Accordingly, no tort-based duty may properly be imposed on ESM Group.

In declining to impose a tort-based duty on ESM Group, I also take into consideration that the Non-Moving Parties have failed to provide any authority declaring a C.I.F. buyer owed tort-based duties to carriers or cargo interests. The dearth of cases is noteworthy and reflects the common law's settled and efficient allocation of liability among the various parties

18

typically involved in maritime shipping arrangements. In order to promote predictability in commercial dealings, I decline to fashion a new theory of buyer liability today. See generally Senator Linie GMBH & Co. KG v. Sunway Line, Inc., 291 F.3d 145, 169 (2d Cir. 2002) (emphasizing the importance of predictability in maritime law); DiGregorio, 411 F. Supp. at 335 ("To impose a duty upon a purchaser of goods to exercise surveillance over the packaging by the seller would be a totally unjustified interference with normal and sound commercial practice.").

Accordingly, I find ESM Group owed no duty to the Non-Moving Parties under the facts of this case. The Non-Moving Parties' negligence claims asserted against ESM Group are dismissed.

## 2. Federal Maritime Common Law Strict Liability Claim

The Non-Moving Parties also argue that ESM Group should be held strictly liable under the federal maritime common law for the damage aboard the RICKMERS allegedly caused by the SS-89 cargo that ESM Group purchased. But, again, the Non-Moving Parties offer no authority supporting their theory of C.I.F. buyer strict liability. Merely pointing to ESM Group's knowledge of SS-89's dangerous characteristics is insufficient as a matter of law to support imposing strict liability on a C.I.F. buyer. For many of the same reasons I rejected the Non-

19

Moving Parties' common law negligence claims, I decline to
fashion a new common law strict liability claim for buyers of
dangerous goods.

I note that the Court of Appeals has recently clarified the
law of shipper strict liability for accidents relating to the
shipment of dangerous goods. See In re M/V DG Harmony, 533 F.3d
83 (2d Cir. 2008); Senator Linie, 291 F.3d 145.  The Court of
Appeals has indicated that COGSA is the exclusive means for
suing cargo shippers in this context. See Senator Linie, 291
F.3d at 168 ("'[T]he exclusive application of COGSA cannot be
avoided by couching claims in terms of negligence or other
common law causes of action.'" (quoting Miller Export Corp. v.
Hellenic Lines, Ltd., 534 F. Supp. 707, 710 (S.D.N.Y. 1982))).
But the Court of Appeals's analysis cannot and should not be
applied wholesale to buyers of dangerous goods, and I see no
reason to fashion a new theory of liability today.[11]
Accordingly, the Non-Moving Parties' strict liability claims
asserted against ESM Group are dismissed.

---

[11] In addition, I reject the Non-Moving Parties' argument that
ESM Group qualifies as a shipper for COGSA purposes. See infra
Part II.C.3.

20

## 3. Liability under COGSA §§ 4(3) and (6)

The Non-Moving Parties contend that ESM Group may be found liable under COGSA §§ 4(3) and (6).[12] COGSA represents "the culmination of a multilateral effort to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade." Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 537 (1995) (internal quotation marks omitted). COGSA limits carriers' and shippers' freedom of contract by essentially inserting certain mandatory liability rules into these parties' bills of lading. Id. at 547 (Stevens, J., dissenting) ("[COGSA] allows a freedom of contracting out of its terms, but only in the direction of increasing the [carrier's] liabilities, and never in the direction of diminishing them. This apparent onesidedness is a commonsense recognition of the inequality in bargaining power . . . [and] is [meant] to prevent the impairment of the value and negotiability of the ocean bill of lading." (emphasis in original)).

---

[12] COGSA was previously codified at 46 U.S.C. app. §§ 1300-1315. In 2006, Congress recodified Title 46 of the U.S. Code. Since then, COGSA has been reprinted in the historical and statutory notes of 46 U.S.C. § 30701. See Pub. L. No. 109-304, 120 Stat. 1485 (2006); see also 46 U.S.C.A. § 30701 (2007); Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc., 547 F.3d 351, 354 n.2 (2d Cir. 2008). For simplicity's sake, this Opinion references the section numbers as listed in the historical note to § 30701.

21

According to COGSA § 4(3), "The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants." COGSA § 4(6) provides,

Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation, and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment.

ESM Group argues that these sections are inapplicable to cargo buyers like itself, because COGSA speaks only of carriers and shippers. The Non-Moving Parties argue that the term "shipper" in COGSA should be interpreted to include buyers.

As with all interpretive endeavors, the language of the statute is controlling. COGSA defines certain terms, but does not define "shipper." See 46 U.S.C. § 30701 note § 1. The Court of Appeals has tended to interpret COGSA according to its plain meaning. See Senator Linie, 291 F.3d at 154. The common dictionary meaning of shipper is a "seaman" or "[o]ne who ships goods for transportation." Oxford English Dictionary (2d ed. 1989). A major maritime treatise defines a shipper as, "[t]he person or company who is usually the supplier or owner of

22

commodities shipped," or the "Consignor." Richard J. Nikas, Technical Glossary, at 64 in 8 Benedict on Admiralty (7th rev. ed. 2008). "Consignor" is defined as a "person or company shown on the bill of lading as the shipper." Id. at 22. Other noted commentators distinguish shippers from consignees. See 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 10-22 (4th ed. 2004). And at least one authority has noted that the international rules on which COGSA was based proceed on the assumption that "[t]he original party to the bill of lading other than the carrier is generally the named shipper." See Sir Richard Aikens et al., Bills of Lading § 7.71 (2006). Cf. U.C.C. § 7-102(a)(12) ("'Shipper' means a person that enters into a contract of transportation with a carrier.")

Thus, according to a plain language interpretation of the term, a COGSA shipper is whomever the carrier contracted with, as evidenced by their bill of lading. The plain language of COGSA does not bear the interpretation proposed by the Non-Moving Parties here--viz., that a third-party buyer who never contracted with a carrier may qualify as a shipper for COGSA purposes.[13]

---

[13] The Non-Moving Parties also argue that ESM Group did, in fact, contract with the carrier here, the RICKMERS. I reject that argument in Part II.C.4, infra.

23

The Non-Moving Parties urge me to disregard the plain
meaning of the term "shipper" and instead use the definition in
the Shipping Act of 1984 (the "Shipping Act")[14]--a definition
that is much broader than the plain meaning of the term permits
and which includes consignees.[15]  The Non-Moving Parties point to
some cases that have apparently employed Shipping Act
definitions to define COGSA terms.  For example, in Ins. Co. of
N. Am. v. M/V Tokyo Senator, a suit by a carrier asserting COGSA
claims against the seller, buyer, and NVOCCs of cargo containing
certain chemicals, the district court used the Shipping Act
definition to find that all three defendants qualified as
shippers. Nos. 95 Civ. 3303 & 96 Civ. 0008, 2001 WL 238293, at
*4 (S.D.N.Y. Mar. 09, 2001).[16]  Also, in Scholastic Inc. v. M/V

---

[14] See 46 U.S.C. §§ 40101-41309.  The Shipping Act was formerly
codified at 46 U.S.C. app. §§ 1701-1719. See Pub. L. No. 98-237,
98 Stat. 67.

[15] According to the Shipping Act § 40102(22), "[t]he term
'shipper' means--(A) a cargo owner; (B) the person for whose
account the ocean transportation of cargo is provided; (C) the
person to whom delivery is to be made; (D) a shippers'
association; or (E) a non-vessel-operating common carrier that
accepts responsibility for payment of all charges applicable
under the tariff or service contract."

[16] In reviewing the decision, the Court of Appeals recognized
that the district court used the Shipping Act definition of
shipper for COGSA purposes, but vacated the district court's
decision on other grounds. Senator Linie, 291 F.3d at 150 & n.5.
In other words, the Court of Appeals had no reason to analyze
the portion of the district court's opinion applying the
Shipping Act definition and merely iterated, (continued . . .)

Kitano, a district court applied Shipping Act definitions to
COGSA terms. 362 F. Supp. 2d 449, 456-57 (S.D.N.Y. 2005).   The
Non-Moving Parties also point to SAT Int'l Corp. v. Great White
Fleet (US) Ltd., which they suggest supports their theory that
the Shipping Act definitions may be used interchangeably with
COGSA terms. No. 03 Civ. 7481, 2006 WL 661042, at *6 & n.7
(S.D.N.Y. Mar. 16, 2006) (unreported).

       I am reluctant to adopt Shipping Act definitions for
purposes of interpreting COGSA terms because the Shipping Act
limits the applicability of its definitions elsewhere. See 46
U.S.C. § 40102 (limiting the definitions included therein with
the prefatory language, "In this part [of the U.S. Code]. . .").
Statutory exegesis rules require consideration of statutory
context when interpreting identical terms. See Atl. Cleaners &
Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)
(cautioning against assigning the same meaning to identical
words used in different statutes when "the scope of the

---

(. . . continued) in dicta, what the district court had done.
Accordingly, Senator Linie is of no precedential value on this
issue.
       Additionally, although the Non-Moving Parties do not cite
it, I note that in another case the Court of Appeals looked to
Shipping Act definitions. See Rexroth, 547 F.3d at 357 (applying
the Shipping Act definitions of "common carrier" and "non-
vessel-operating common carrier").   However, in that case the
Court of Appeals had no reason to analyze the appropriateness of
using the Shipping Act definition of shipper for a COGSA
analysis.   Thus, Rexroth is also of no precedential value on
this issue.

legislative power exercised in one [statute] is broader than that exercised in another"); accord Envtl. Def. v. Duke Energy Corp., 549 U.S. 561, 574 (2007). While the Court of Appeals has indeed looked to Shipping Act terms for guidance in the context of COGSA analyses, see Senator Linie and Rexroth, it has yet to analyze whether the Shipping Act definition of shipper should be used for COGSA purposes. I conclude that it should not.

The Shipping Act is fundamentally a regulatory regime that serves two primary goals: providing antitrust immunity to ocean carriers who form Shipping Conferences and creating new tools for shipper-interests to obtain better services and lower rates from carriers. See generally 1C Benedict on Admiralty, ch. II, §§ 9-18; Peter A. Friedmann & John A. Devierno, The Shipping Act of 1984: The Shift from Government Regulation to Shipper "Regulation", 15 J. Mar. L. & Com. 311, 313-14, 320 (1984). The Shipping Act is administered by the Federal Maritime Commission (the "FMC"). See Fed. Mar. Comm'n v. S. Carolina State Ports Auth., 535 U.S. 743, 774-75 (2002). The FMC is tasked with reviewing shipping agreements so as to regulate rates and services offered to the shipper market. See 46 U.S.C. §§ 40301-40307; Friedmann & Devierno, supra, at 327-28; see also 46 U.S.C. § 40101 (describing the purposes of the Act as regulating common carriage of goods and providing an efficient economic transportation system). The Shipping Act also provides tools to

26

potential shippers in order to improve their bargaining position when they shop for carriers. See Friedmann & Devierno, supra, at 344. With this context in mind, it is not surprising that Congress defined "shipper" broadly so as to encompass the shipper market as a whole, as opposed to identifiable shippers who have already contracted with identifiable carriers. See also 1C Benedict on Admiralty, ch. III, § 12A (noting that the recodification of the Shipping Act at 42 U.S.C. § 40102 defines shipper "broadly").

In any event, the Shipping Act was not meant to affect maritime parties' rights and liabilities for purposes of civil litigation. Plaintiffs may not sue under the Shipping Act unless and until they have lodged a complaint with the FMC and an investigation has been concluded. See 46 U.S.C. § 41306(a); see also F.W. Myers Co. v. World Projects Int'l, Inc., 903 F. Supp. 353, 355-56 (N.D.N.Y. 1995). And even then, plaintiffs may only sue for injunctive relief in accordance with an FMC investigation. See 46 U.S.C. § 41306(c); see also Port Auth. of New York & New Jersey v. Maher Terminals, LLC, No. Civ. 08-2334, 2008 WL 2354945, at *3 (D.N.J. June 3, 2008) ("[N]o provision of the Shipping Act of 1984 provides a federal cause of action for violations of the Act.").

COGSA, on the other hand, does affect maritime parties' rights and liabilities for purposes of civil litigation. COGSA

27

is fundamentally concerned with efficiently and equitably allocating the contractual rights and obligations of carriers and shippers who have actually contracted with each other. See Senator Linie, 291 F.3d at 158. COGSA invalidates carriers' onerous limited-liability provisions in their bills of lading, which are essentially contracts of adhesion because carriers historically have exercised dominant bargaining power. See M/V Sky Reefer, 515 U.S. at 543-44. As such, COGSA establishes rules that overlay bills of lading between carriers and their identifiable contracting partners--usually suppliers and consignors, as the plain meaning of the term "shipper" suggests. Unlike the Shipping Act, COGSA provides no textual support for broadening the plain meaning of the term "shipper" to include non-contracting third-parties or potential shippers. The text of COGSA does not even mention buyers or consignees, let alone "the person for whose account the ocean transportation of cargo is provided" or "the person to whom delivery is to be made." Cf. 46 U.S.C. § 40102(22).[17] Thus, I find the Shipping Act's

---

[17] Of course COGSA does not prohibit binding such parties to bills of lading or prevent contracting parties from agreeing that buyers or consignees shall have the same rights and obligations as shippers under COGSA. See Aikens, supra, at § 7.72 ("[T]he bill [of lading] does not always evidence a contract between the carrier and the named shipper. . . . [I]t may be the case that [ ] the bill of lading evidences a contract with someone other than the named shipper, for example, the consignee . . . ."). As such, determining whether a third-party buyer or consignee was actually bound to a (continued . . .)

28

definition of shipper particularly ill-suited for purposes of determining who should be subject to COGSA's shipper rules. Cf. Madonna Shipping Servs., Inc. v. Mediterranean Shipping Co. S.A., No. 06 Civ. 1200, 2007 WL 2775138, at *3 & n.2 (S.D.N.Y. Sept. 24, 2007) (unreported) (doubting the validity of using Shipping Act definitions for determining the applicability of COGSA rules); APL Co. Pte. v. UK Aerosols Ltd., No. C 05-00646, 2007 WL 607902, at *4 (N.D. Cal. Feb. 23, 2007) (unreported) (applying the plain meaning definition of shipper over the Shipping Act definition).

Here, ESM Group did not contract with the Rickmers Interests, see infra Part II.C.4, and was a mere consignee. ESMT, on the other hand, through Pudong, contracted with the Rickmers Interests and thus qualifies as the shipper in this case. For these reasons, I find that COGSA imposes rights and obligations on ESMT, but not on ESM Group. Accordingly, the Non-Moving Parties' COGSA claims asserted against ESM Group are dismissed.[18]

---

(. . . continued) bill of lading is a matter of contract construction and must be accomplished by examining the terms of bills of lading. See infra Part II.C.4.

[18] Because I conclude that COGSA does not apply to ESM Group, I have not reached the questions of (1) whether cargo interests have standing to bring claims under COGSA, see In re DG Harmony, 533 F.3d 83, 93 (2d Cir. 2008), (2) whether SS-89 qualifies as a dangerous good under COGSA, or (3) what knowledge, if any, the Rickmers Interests had about SS-89 at the time of the accident.

## 4. Contract Liability

The Rickmers Interests assert a breach of contract claim against ESM Group.[19] Additional facts about the bills of lading are necessary to evaluate this claim. As noted above, ESMT arranged for Pudong to pick up the SS-89 at the Tianjin plant and transport it to the Xingang port. From there, the RICKMERS was to deliver the cargo to the United States. On or around March 3, 2005, Pudong picked up the SS-89 from the Tianjin plant. Pudong issued ESMT a bill of lading identifying ESMT as the "shipper/exporter" and identifying "To Order of Shipper" as the "consignee." (See O'Connor Aff., Ex. 15.) The bill also identified the RICKMERS as the transporting "vessel." (Id.) The bill required the "Merchant" to inform the carrier in writing of the exact nature of dangerous goods and reprinted COGSA's dangerous goods strict liability provisions for shippers. (Id. ¶¶ 6(1)-(2).) The bill defined "Merchant" to include "the shipper, the Consignor, the Holder of this Bill of Lading, the Receiver and the Owner of the Goods." (See id. at "Definitions".)

Once Pudong delivered the SS-89 to the RICKMERS, the Rickmers Interests issued Pudong a bill of lading identifying Pudong as the "shipper," U.S. Shipping, Inc. as the "consignee,"

---

[19] The Cargo Interest Plaintiffs have not asserted a breach of contract claim against ESM Group.

30

and the RICKMERS as the "vessel." (Id. Ex. 16.) That bill
provided that "the Merchant shall indemnify the Carrier against
all claims, losses, damages or expenses arising in consequence
of the Carriage of [dangerous] Goods." (Id. ¶ 19(3).) The bill
defined "Merchant" to include "the Shipper, Holder, Consignee,
Receiver of the Goods or of this Bill of Lading, any Person
owning or entitled to the possession of the Goods or this Bill
of Lading and anyone acting on behalf of any such person." (Id.
at "Definitions".)

The Rickmers Interests argue that, pursuant to the
definitional sections of the Pudong and Rickmers bills of
lading, ESM Group qualifies as a "Merchant" and thus should be
bound to the terms of both contracts. The Rickmers Interests
also argue that they were a party to the Pudong bill of lading
and can enforce its terms against ESM Group and ESMT.
Accordingly, the Rickmers Interests argue that both ESM Group
and ESMT are obligated to indemnify the Rickmers Interests for
the loss allegedly caused by the SS-89 cargo and are liable for
their failure to warn the Rickmers Interests about the known
dangers of shipping SS-89. (Rickmers Opp'n Mem. at 7-8.) ESM
Group counters that it was never a party to either bill of
lading, irrespective of what the definitional sections say, and

31

made no representations to the Rickmers Interests. (ESM Mem. at 17.)[20]

Having already determined that federal maritime common law applies to the claims in this case, I will look to common law principles of contract formation and interpretation to determine whether ESM Group was bound by the bills of lading. See Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 31 (2004) ("[C]ontracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties.").

The Court of Appeals has reaffirmed the common law principle that a party is not bound to the terms of a bill of lading unless the party consents to be bound. Stein Hall & Co. v. S.S. Concordia Viking, 494 F.2d 287, 291 (2d Cir. 1974); see also Excel Shipping, 584 F. Supp. at 748 ("To enforce the bill of lading provisions against [a non-party buyer] . . . would have the anomalous result of creating a greater scope of liability for a consignee having no active participation in the shipment of goods than for the shipper itself."). Other courts

---

[20] Furthermore, ESM Group disputes the allegation that ESMT contracted on behalf of ESM Group as its agent. As explained above and in Part II.C.5, infra, I consider the Non-Moving Parties' agency theory of liability to be conceptually distinct from the Non-Moving Parties' contract and tort claims. Accordingly, for the purposes of this Part's analysis, I evaluate the contract claim treating ESM Group as a distinct entity and not in a principal/agent relationship with ESMT.

have stated the converse conclusion, that "[a] party cannot unilaterally employ definitions to bind another [party to] . . . provisions to which the other [party] has not consented to be bound." United States v. Waterman S.S. Corp., 471 F.2d 186, 189 n.4 (5th Cir. 1973).

Of course, common law third-party beneficiary principles may be applicable when interpreting bills of lading. Generally, the Restatement says that to the extent a third-party qualifies as an intended beneficiary,[21] it may enforce contract terms in its favor. Restatement (Second) of Contracts § 304 (1981). However, qualifying as an intended beneficiary in no way creates contractual obligations on the part of the intended beneficiary. See, e.g., Stein Hall, 494 F.2d at 291 ("While the carrier and the shipper can extend certain contractual protections, such as the limitation on damages, to stevedores as third-party beneficiaries, they cannot contract to bind an unconsenting

---

[21] Unless otherwise agreed to by the contracting parties, an intended beneficiary is any

> beneficiary of a promise . . . [so long as] recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the [contracting] parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302(1) (1981).

33

third party." (citation omitted)). As one court has noted, the two primary methods for actually binding an intended beneficiary to a bill of lading are showing that the third party exhibited acceptance to be so bound and through an agency relationship with one of the contracting parties. Taisheng Int'l Ltd. v. Eagle Mar. Servs., Inc., No. Civ. A. H-05-1920, 2006 WL 846380, at *4 (S.D. Tex. Mar. 30, 2006) (unpublished). Absent such a showing, contractual obligations cannot be imposed on an intended beneficiary.

With these general contract rules in mind, I note that courts have differed in their interpretation of the types of so-called Merchant Clauses that were included in the Pudong and Rickmers bills of lading. Some courts have held that when a third-party who falls within a Merchant Clause sues on a bill of lading, the third-party in effect accepts the bill of lading and becomes a party to the contract. See, e.g., Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co., 215 F.3d 1217, 1222 (11th Cir. 2000) (citing All Pac. Trading, Inc. v. Vessel M/V Hanjin Yosu, 7 F.3d 1427, 1431-32 (9th Cir. 1993)). Some courts have been more circumspect with their terminology and hew more closely to third-party beneficiary principles. See, e.g., Eimskip v. Atl. Fish Mkt., Inc., 417 F.3d 72, 78 (1st Cir. 2005) (noting that the "'merchant' definition in the bill of lading-- although it probably embraces [the buyer-plaintiff]--arguably is

34

not binding on someone who was not (in some fashion) a party to the bill of lading or otherwise accepted [its] obligation[s]"). The Court of Appeals has not addressed the binding effect of Merchant Clauses in bills of lading. For the purposes of this Opinion, I will follow the general contract rules.

Here, although ESM Group likely falls within the scope of both Merchant Clauses, there is no evidence that ESM Group consented to be bound by either bill of lading. ESMT and Pudong were the contracting parties to the Pudong bill of lading. Similarly, Pudong and the Rickmers Interests were the contracting parties to the Rickmers bill of lading. There is no evidence ESM Group was a party to either bill or consented to be bound to their terms.

While ESM Group, as the cargo purchaser and ultimate consignee, may certainly have been an intended third-party beneficiary, that status alone is insufficient to warrant a finding that ESM Group was bound to comply with the Merchant's obligations as described in both bills of lading. Accordingly, I find that ESM Group was not bound by the bills of lading and the Rickmers Interests' contract claim asserted against ESM Group is dismissed.[22]

---

[22] The Rickmers Interests also apparently contend that ESM Group made warranties and negligent misrepresentations, apart from anything contained in the Rickmers and Pudong bills of lading. (See Rickmers Compl. at ¶¶ 34-38). However, *(continued . . .)*

## 5. Federal Maritime Common Law of Agency and Veil Piercing

In their memoranda and at oral arguments, the Non-Moving Parties assume or cursorily conclude that ESM Group and ESMT are sufficiently related to hold each liable for the other's torts, contracts, and statutory obligations. (See Rickmers Opp'n Mem. 13; see also Cargo Opp'n Mem. at 5-6.) In this regard, the Non-Moving Parties apparently propose that I apply corporate veil piercing and agency theories in order to extend ESMT's liability to ESM Group. (Rickmers Opp'n Mem. at 13 nn.4-6.) ESM Group counters by arguing that its status as a C.I.F. buyer and parent corporation vitiates any legal basis for extending ESMT's liability to ESM Group. ESM Group also argues that the Non-Moving Parties should be precluded from raising agency and veil piercing theories in this case because the Non-Moving Parties insufficiently pleaded those theories in their Complaints. I address these arguments in turn.

---

(. . . continued) no evidence has been offered tending to show that ESM Group ever warranted or represented anything to the Rickmers Interests. To the extent that the Rickmers Interests maintain these claims against ESM Group, they are also dismissed.

Additionally, in light of my conclusion that ESM Group was not bound to the Pudong bill of lading, I need not address the Rickmers Interests' argument that they were a party to the Pudong bill of lading.

36

## a)   The Non-Moving Parties' Agency Theory

Federal maritime common law embraces principles of agency.

See Dow Chem. Pac. Ltd. v. Rascator Mar. S.A., 782 F.2d 329,

339-43 (2d Cir. 1986); Kirno Hill, 618 F.2d at 985.   In

specifying the contours of federal maritime common law agency

principles, courts of this Circuit have looked to the

Restatement (Second) of Agency (1958). See, e.g., Dow Chem., 782

F.2d at 340; Interocean Shipping Co. v. Nat'l Shipping & Trading

Corp., 523 F.2d 527 (2d Cir. 1975) (apparently applying New York

law and federal maritime common law, as stated by the district

court in 462 F.2d 673, 676 n.6, but relying primarily on the

Restatement).[23]

---

[23] As an aside, I reject the Non-Moving Parties' argument that I
should automatically assume an agency relationship existed
between ESM Group and ESMT.   It is true that intermediaries,
such as NVOCCs, may be assumed to be acting as agents for
shippers, but only insofar as the agent contracts to limit
carriers' liability downstream. See Norfolk, 543 U.S. at 33.
Agency is only to be assumed in this limited context, and the
assumption does not extend to consignor/consignee relationships.
The Non-Moving Parties have supplied no authority from the
Second Circuit that supports such an extension.   And objective
commentators reject it. See Julian Cooke et al., Voyage Charters
§ 18.77 (3d ed. 2007) ("[T]he general rule is that a party who
procures shipment for the ultimate benefit of a consignee does
not thereby contract with the carrier as agent of the
consignee.").   If taken literally, the notion that consignors
and consignees can be assumed to be in a principal/agent
relationship would expose consignees to potentially limitless
liability for the conduct and contracts of their consignors.
Clearly that cannot be the case.   Rather, agency theories of
liability must be considered on a case-by-case basis and should
not be assumed.   Accordingly, a proper analysis of the
relationship between ESM Group and ESMT must *(continued . . .)*

37

Case 1:05-cv-06226-LAP Document 70 Filed 03/31/09 Page 38 of 46

"An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Restatement (Second) of Agency § 15; see also id. § 1 (agency generally). "[A]uthority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Id. § 26; see also id. § 34 (circumstances considered in interpreting authority). A principal has the power to control the agent's conduct regarding matters entrusted to the agent. Id. § 14.

An undisclosed principal is bound by contracts made on the principal's behalf by an agent acting within the scope of the agent's authority. See Dow Chem., 782 F.2d at 339; Kirno Hill, 618 F.2d at 985; see also Restatement (Second) of Agency § 186. And a principal may be liable for the torts committed by her agent. See generally Restatement (Second) of Agency, ch. 7.

ESM Group contends that by the express terms of a C.I.F. sale, contractual parties cannot qualify as agents. (ESM Reply Mem. at 13.) This contention is untenable as a matter of law because agency depends not on contractual formalities but on

_____

(. . . continued) be conducted before determining whether ESMT's liability may be extended to ESM Group.

38

whether an agreement was made between principal and agent to the effect that the agent will act on the principal's account. See Restatement (Second) of Agency § 1 cmt. b ("The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so. To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relation between them to which are attached the legal consequences of agency, an agency [relationship] exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow."). In other words, because agency is determined according to extant factual circumstances, a contractual disclaimer or acknowledgement of agency is not dispositive for purposes of determining whether an agency relationship exists as a matter of law. See Interocean, 523 F.2d at 537. In this regard, I also reject ESM Group's argument that the absence of its identification as the consignee in the Pudong bill of lading vitiates ESM Group's alleged agency relationship with ESMT. (See ESM Reply Mem. at 13-14.)

Here, a genuine factual issue exists as to whether ESM Group and ESMT agreed that ESMT would act on ESM Group's account. ESM Group established ESMT apparently for the sole purpose of manufacturing SS-89 and its component parts. ESM

Group paid ESMT's material suppliers directly, tending to prove that ESMT was acting primarily for ESM Group's account. (Zhou Zhou Tr. at 239.) Particularly probative is the evidence that ESM Group had the power to direct ESMT to alter its MSDS for magnesium granules, that ESM Group limited ESMT's ability to sell to other buyers, and that ESMT would have distributed an MSDS for the shipments of SS-89 if ESM Group had instructed ESMT to do so. (Zhou Zhou Tr. at 93-99, Ex. 93.) ESM Group and ESMT were not acting as arms-length contracting parties, and I find significant indicia of ESM Group's control over ESMT.[24] The C.I.F. terms of the January 25, 2005 purchase order are not dispositive.

At a minimum, the Non-Moving Parties have presented evidence to present a genuine issue for trial concerning whether ESM Group and ESMT had a principal/agent relationship. Accordingly, ESM Group's motion for summary judgment, as to the Non-Moving Parties' agency theory, is denied.

---

[24] I have reviewed Mr. Zhou's testimony, offered to show that ESMT was not controlled by ESM Group. (See, e.g., Zhou Zhou Tr. at 190.) Taking the evidence in the light most favorable to the Non-Moving Parties and without making a credibility determination, Mr. Zhou's testimony is insufficient to meet ESM Group's summary judgment burden.

40

## b) The Non-Moving Parties' Veil Piercing Theory

Under the federal maritime common law, courts may pierce

the corporate veil when a parent so dominates and disregards a

subsidiary's corporate form that the subsidiary primarily

transacts the parent's business rather than its own business.

See Kirno Hill, 618 F.2d at 985. Courts are reluctant to pierce

a corporate veil but may do so when presented with a

particularly egregious case of domination and control. See N.

Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1401-02

(D. Conn. 1997). In determining whether sufficient domination

and control existed to warrant piercing a corporate veil, courts

have considered fifteen factors:

> (1) common or overlapping stock ownership between
> parent and subsidiary; (2) common or overlapping
> directors and officers; (3) use of same corporate
> office; (4) inadequate capitalization of subsidiary;
> (5) financing of subsidiary by parent; (6) parent
> exists solely as holding company of subsidiaries; (7)
> parent's use of subsidiaries' property and assets as
> its own; (8) informal intercorporate loan
> transactions; (9) incorporation of subsidiary caused
> by parent; (10) parent and subsidiary's filing of
> consolidated income tax returns; (11) decision-making
> for subsidiary by parent and principals; (12)
> subsidiary's directors do not act independently in
> interest of subsidiary but in interest of parent; (13)
> contracts between parent and subsidiary that are more
> favorable to parent; (14) non-observance of formal
> legal requirements; (15) existence of fraud,
> wrongdoing or injustice to third parties.

Id. at 1402; see also Williamson v. Recovery Ltd. P'ship, 542

F.3d 43, 53 (2d Cir. 2008) ("Instead of a firm rule, the general

principle guiding courts in determining whether to pierce the
corporate veil has been that liability is imposed when doing so
would achieve an equitable result." (internal quotation marks
omitted)).  No one factor is required. See Backstrom, 967 F.
Supp. at 1402.  As is evident from the above listed factors, a
showing of fraud may assist in a court's decision to pierce the
corporate veil but is not required. Id.; Dow Chem., 782 F.2d at
342.

Here, the evidence presented raises triable issues as to
whether piercing the corporate veil is warranted.  The Non-
Moving Parties have pointed to the facts that:  ESMT is a
wholly-owned subsidiary of ESM Group and may have been created
to circumvent U.S. import laws or obtain lower prices for
certain materials previously imported by ESM Group; ESM Group
directors sit on ESMT's board, sometimes constituting the entire
ESMT board; ESM Group provides substantial financing to ESMT;
ESM Group designed ESMT's plant to manufacture SS-89 and
supplied the capital, machinery, and expertise necessary to
start the operation; ESM Group developed the specifications for
SS-89, gave that formula to ESMT, and instructed ESMT personnel
on how to make SS-89; ESM Group conducts oversight of ESMT
production facilities and procedures; a significant majority of
ESMT's output is sold to ESM Group, and ESM Group fulfills its
SS-89 needs from ESMT; although apparently sufficiently

42

capitalized, ESMT's net profits were comparatively small in 2004 and 2005.  This evidence tends to show that ESMT was transacting ESM Group's business rather than its own business.  Taking this evidence as a whole, it is sufficient to create a triable issue as to whether veil piercing is warranted in this case.

Accordingly, ESM Group's Motion for Summary Judgment, as to the Non-Moving Parties' veil piercing theory, is denied.[25]

## c)   The Sufficiency of the Non-Moving Parties' Pleadings

ESM Group complains of the Non-Moving Parties' failure to plead agency and veil piercing theories in their Complaints.  I note that the Non-Moving Parties' Complaints did in fact include

---

[25]  In addition to their veil piercing theory of liability, the Non-Moving Parties apparently intend to assert a separate alter-ego theory. (Rickmers Opp'n Mem. at 13 n.5.)  However, the Non-Moving Parties have failed to argue that this theory exists under the federal maritime common law.  The cases the Non-Moving Parties cite in their memoranda do not apply federal maritime common law and thus do not stand for the proposition that the federal maritime common law embraces an alter-ego theory distinguishable from the veil piercing theory. See Rickmers Opp'n Mem. at 13 n.5 (citing Goodman Piping Prods., Inc. v. NLRB, 741 F.2d 10 (2d Cir. 1984); Jacobson v. Metro. Switchboard Co., Inc., No. 05-CV-2224, 2007 WL 1774911 (E.D.N.Y. June 18, 2007) (unreported)).  In light of the Non-Moving Parties' dearth of authority, I doubt whether an alter-ego theory is cognizable under the federal maritime common law. Cf. Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 138 (2d Cir. 1991) (concluding that under New York law, the piercing the corporate veil and alter-ego theories are "indistinguishable").  Accordingly, to the extent the Non-Moving Parties intend to assert an alter-ego theory separate from veil piercing, it is dismissed.

allegations that ESM Group and ESMT had an agency relationship (see Chem One Compl. at ¶¶ 14, 19, 28, 37), and that the two entities were "related companies" (see Rickmers Compl. at ¶ 10). Even if these allegations failed to put ESM Group on notice of the Non-Moving Parties' theories of liability, see Fed. R. Civ. P. 8(a), I find that the Non-Moving Parties should be entitled to amend their Complaints in light of the evidence adduced in consideration of this Motion for Summary Judgment.

In its seminal pronouncement on when leave to amend should be granted, the Supreme Court stated,

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.   In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962); accord Kaster v. Modification Sys., Inc., 731 F.2d 1014, 1018-19 (2d Cir. 1984). ESM Group primarily argues that leave to amend should not be granted because the Non-Moving Parties have failed to comply with ESM Group's contention interrogatories.   However, I find that although the Non-Moving Parties' responses to the interrogatories were vague, ESM Group was not unduly prejudiced by these deficiencies.   Particularly because I find that the

44

Non-Moving Parties' agency and alter-ego theories survive ESM
Group's Motion for Summary Judgment, leave to amend is warranted
in order to aid this Court in testing the claims on the merits.
See Fed. R. Civ. P. 15(a)(2).

Therefore, the Non-Moving Parties are hereby granted leave
to amend their complaints to include veil piercing and agency
allegations only.

### III. Conclusion

For the reasons stated herein, ESM Group's Motion for
Summary Judgment [dkt. no. 84 (4261 action)] is DENIED in part
and GRANTED in part.[26]  The Non-Moving Parties' negligence,
strict liability, COGSA, and contract claim asserted against ESM
Group are dismissed.  The Non-Moving Parties' agency and veil
piercing theories of liability may proceed.  I take no position
on the liability of ESMT or other parties in this litigation.

---

[26] Additionally, ESM Group's Motion to Strike Filed Portions of
the Papers in Opposition to its Summary Judgment Motion [dkt.
no. 101 (4261 action)] is DENIED. See supra note 7.

The parties shall confer and inform the Court by letter no later than April 10, 2009 as to how they propose to proceed.


DATED:    New York, New York
          March 31, 2009

                         *Loretta A. Preska*

                    LORETTA A. PRESKA, U.S.D.J.